## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 17 2020, 8:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stephen Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tiffany A. McCoy
Deputy Attorney General
Indianapolis, Indianan

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.L.B., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner.* | September 17, 2020 <br><br> Court of Appeals Case No. <br> 20A-JV-713 <br><br> Appeal from the <br> Tippecanoe Superior Court <br><br> The Honorable <br> Faith A. Graham, Judge <br> The Honorable <br> Tricia L. Thompson, Magistrate <br><br> Trial Court Cause No. <br> 79D03-1912-JD-289 |

**Kirsch, Judge.**

[1] D.L.B. appeals his adjudication as a delinquent child for committing battery,[1] which would be a Class B misdemeanor if committed by an adult and battery with a deadly weapon,[2] which would be a Level 5 felony if committed by an adult. He raises the following issue for our review: whether his convictions for both battery and battery with a deadly weapon violate the continuous crime doctrine.

[2] We affirm.

## Facts and Procedural History

[3] On December 20, 2019, Savaria Bolden ("Savaria") was visiting her boyfriend, John Johnson ("Johnson"), at the apartment where Johnson was living. *Tr.* 10-11, 33. At some point after Savaria arrived, her younger brother, J.B. entered the apartment. *Id*. at 23, 33-34. Savaria and Johnson began to argue, and J.B. observed the argument. *Id*. at 23, 34. According to Johnson and Savaria, the argument was verbal and not physical, although at least one witness stated that the argument was physical with Johnson and Savaria striking each other. *Id*. at 23-24, 34-35, 90. In response to the altercation between Johnson and Savaria, J.B. became upset, began crying, ran outside the apartment, and called either D.L.B., who is the brother of both J.B. and Savaria, or another family member, to tell them about the fight between Johnson and Savaria. *Id*. at 34-35.

---

[1] *See* Ind. Code § 35-42-2-1(c)(1).

[2] *See* Ind. Code § 35-42-2-1(c)(1), (g)(2).

[4]     A short time later, and after being told that Johnson had allegedly hit Savaria, Robert Bolden ("Robert"), who is Savaria's father, D.L.B., and two of Savaria's sisters ("the sisters") entered the apartment without being let in by any of the occupants. *Id.* at 12-13. Savaria was in the back bedroom and heard one of the sisters, yell "[D.L.B.] beat his ass," and Savaria exited the bedroom and ran towards the front of the apartment. *Id.* at 35-37. As soon as D.L.B. walked into the apartment, he punched Johnson in the face, and the two started to fight by wrestling each other. *Id.* at 13, 24, 30. At this point, Savaria had reached the room and observed the fight. *Id.* at 37. While fighting, Johnson and D.L.B. fell onto the couch and then onto the floor. *Id.* at 13, 37-38. While they were wrestling on the floor, Johnson bit D.L.B.'s neck. *Id.* at 22, 26, 27. Around this time, Robert and the sisters started punching, kicking, and hitting Johnson with a golf club. *Id.* at 13, 41. To protect himself from the assault, Johnson "ball[ed] up" on the floor. *Id.* at 20, 26.

[5]     At some point, D.L.B. was able to get up from the floor and stand up. *Id.* at 27. He then started to hit Johnson with the golf club. *Id.* at 13, 21-22, 27, 41. Johnson testified that D.L.B., Robert, and the sisters were "taking turns" hitting him with the golf club. *Id.* at 27. During the assault, Johnson was hit in the face, neck, back, shoulder, and groin, and he had to go to the hospital for his injuries. *Id.* at 13-14. Several of Johnson's dreadlocks were also pulled from his head during the altercation. *Id.* at 16.

[6]     After approximately five minutes, D.L.B. and the others stopped hitting Johnson. *Id.* When Johnson was able to get up, he noticed that the television

was missing from the living room. *Id*. at 17. Johnson went outside and saw one of the sisters who had been involved in the fight trying to put the television into a car. *Id*. Johnson attempted to get the television out of the car, and one of the sisters who was driving the car tried to drive away with the television. *Id*. at 17-18. Johnson was almost hit by the car but was able to move out of the way and went back inside the apartment. *Id*. at 18.

[7] At least two calls were made to 911 relating to the incident at the apartment. *Id*. at 62, 75. One call was made by a neighbor, reporting that "there were [a] bunch of people that were fighting" in an apartment, and another call was made by the sister driving the car that took the television, complaining about damage to her car. *Id*. at 62, 75. Lafayette Police Department Officers Michael Sears ("Officer Sears") and Austin Bontrager ("Officer Bontrager") responded separately to these 911 calls. *Id*. at 61-62, 74-75. When Officer Bontrager arrived on the scene, he spoke to the sister about her car, while Officer Sears went to speak with Johnson and Savaria. *Id*. at 62-63, 75-76.

[8] Officer Sears immediately requested medics to check on Johnson's injuries sustained in the fight, specifically the head injury. *Id*. at 63. Officer Sears observed that some furniture in the apartment had been knocked over, some of Johnson's dreadlocks were on the ground, and there was blood on the floor and on the wall of the apartment. *Id*. at 65. Johnson gave a statement to Officer Sears, which was consistent with the injuries that the officer observed and the evidence in the apartment, and based on the statement, officers attempted to locate a golf club. *Id*. at 66-67.

[9] As Officer Bontrager was speaking to the sister in the parking lot about her car, D.L.B. arrived in a car driven by his mother. *Id*. at 67, 77. Initially, D.L.B. told Officer Bontrager that he had not been at the apartment that night. *Id*. at 78. However, after Officer Bontrager went back to speak with the sister, who told the officer that D.L.B. had been at the apartment, D.L.B. admitted to being at the apartment and to getting into a fight with Johnson. *Id*. Officer Bontrager observed that D.L.B.'s hands were bloody and that his knuckles were scraped. *Id*. at 78-79. D.L.B. was arrested for battery, which would be a Class B misdemeanor if committed by an adult, and battery with a deadly weapon, which would be a Level 5 felony if committed by an adult. *Appellant's App. Vol. II* at 7. While Officer Sears was transporting D.L.B. to the juvenile detention center, D.L.B. stated that he had hit Johnson with his fists. *Tr*. at 68.

[10] On December 27, 2019, the State filed a delinquency petition against D.L.B., alleging that D.L.B. was a delinquent child for committing the two battery counts, along with disorderly conduct, which would be a Class B misdemeanor if committed by an adult, and two counts of intimidation, which would be Level 6 felonies if committed by an adult. *Appellant's App. Vol. II* at 36-37. Fact-finding hearings were held on February 20, 2020 and February 24, 2020, on the two battery counts, and the State moved to dismiss the disorderly conduct and intimidation counts. *Id*. at 72-75. At the conclusion of the hearings, the juvenile court adjudicated D.L.B. delinquent on the counts of battery and battery by means of a deadly weapon. *Id*. at 74-75; *Tr*. at 153. The dispositional hearing was held, and the juvenile court made D.L.B. a ward of

the Indiana Department of Correction. *Appellant's App. Vol. II* at 76-81. D.L.B. now appeals.

## Discussion and Decision

[11]  D.L.B. argues that his convictions for both battery and battery with a deadly weapon violate the continuous crime doctrine. He asserts that the actions for which he was adjudicated delinquent were so compressed in time, place, singleness of purpose, and continuity of action as to constitute a single transaction for purposes of the continuous crime doctrine. D.L.B. maintains that the actions took place on the same night, in the same apartment, against the same victim and lasted only about five minutes. He, therefore, contends that the evidence most favorable to the juvenile court's findings indicates that the attack was a single transaction. Because his actions constituted a single transaction, he claims his convictions for both Class B misdemeanor battery and Level 5 felony battery with a deadly weapon violate the continuous crime doctrine, and he argues that his conviction for Class B misdemeanor battery should be vacated.

[12]  The continuing crime doctrine, also known as the continuous crime doctrine, "is a rule of statutory construction and common law limited to situations where a defendant has been charged multiple times with the same offense." *Hines v. State*, 30 N.E.3d 1216, 1219 (Ind. 2015). Under the continuous crime doctrine, "'actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose,

and continuity of action as to constitute a single transaction.'" *Anderson v. State,* 15 N.E.3d 147, 149 (Ind. Ct. App. 2014) (quoting *Riehle v. State,* 823 N.E.2d 287, 296 (Ind. Ct. App. 2005), *trans. denied*). "'The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime.'" *Hines*, 30 N.E.3d at 1219 (quoting *Boyd v. State,* 766 N.E.2d 396, 400 (Ind. Ct. App. 2002)). The purpose of the continuing crime doctrine is to prevent the State from charging a defendant twice for the same continuous offense. *Riehle*, 823 N.E.2d at 296. "The focus . . . should be on the specific actions alleged." *Heckard v. State*, 118 N.E.3d 823, 832 (Ind. Ct. App. 2019), *trans. denied*.

[13] Here, D.L.B. was adjudicated to be delinquent for committing battery, which would be a Class B misdemeanor if committed by an adult, and battery with a deadly weapon, which would be a Level 5 felony if committed by an adult. Under Indiana Code section 35-42-2-1(c)(1), it is a Class B misdemeanor for an individual to knowingly or intentionally touch another person in a rude, insolent, or angry manner. The statute further provides that knowingly or intentionally touching another person in a rude, insolent, or angry manner with a deadly weapon, is a Level 5 felony. Ind. Code § 35-42-2-1(g)(2). In its delinquency petition, the State alleged that D.L.B. committed Class B misdemeanor battery when he "knowingly or intentionally touched another person in a rude, insolent, or angry manner." *Appellant's App. Vol. II* at 26. The State also alleged that D.L.B. committed Level 5 felony battery by means of a

deadly weapon when he did "knowingly or intentionally touch[ed] [Johnson] in a rude, insolent or angry manner, said touching being committed with a deadly weapon, to wit: a golf club." *Id.*

[14] The evidence presented at the fact-finding hearing showed that D.L.B. and other family members entered the apartment where Johnson was living at the time. *Tr.* at 13. As soon as D.L.B. walked into the apartment, he punched Johnson in the face, and the two started to fight by wrestling each other. *Id.* at 13, 24, 30. While fighting, Johnson and D.L.B. fell onto the couch and then onto the floor. *Id.* at 13, 37-38. As they were wrestling and fighting on the floor, Johnson bit D.L.B.'s neck. *Id.* at 22, 26, 27. At the same time, the fight was occurring on the floor, Robert and the sisters started punching, kicking, and hitting Johnson with a golf club. *Id.* at 13, 41. D.L.B. was able to get up from the floor, stand up, and began to hit Johnson with the golf club. *Id.* at 13, 21-22, 27, 41. Johnson described that during the attack D.L.B., Robert, and the sisters were "taking turns" hitting him with the golf club. *Id.* at 27.

[15] The evidence presented established that the Class B misdemeanor battery occurred when D.L.B., after being told that Johnson had allegedly hit Savaria, struck Johnson in the face immediately after entering the apartment. After this initial punch, D.L.B. and Johnson began to fight and wrestle, falling to the floor. D.L.B. was then able to get up from the floor, and he then took turns with the other individuals involved in the attack hitting Johnson with the golf club. Nothing in the evidence presented indicated that D.L.B.'s actions of punching Johnson and hitting him with the golf club occurred simultaneously.

Rather, the fact that D.L.B. got up from wrestling with Johnson on the floor and then began to hit Johnson with the golf club established that one action must have terminated before another began. This is especially true considering the fact that the individuals involved in striking Johnson with the golf club, including D.L.B., were taking turns hitting Johnson with the golf club. "The purpose [of the continuous crime doctrine] is to prevent the State from charging a defendant twice for the same continuous offense." *Firestone v. State,* 838 N.E.2d 468, 472 (Ind. Ct. App. 2005). Therefore, even though committed very close in time, the two distinct battery offenses in the present case constitute separate and distinct crimes and do not violate the continuous crime doctrine.

[16] In his argument that his adjudications violated the continuous crimes doctrine, D.L.B. relies on *Gomez v. State*, 56 N.E.3d 697, 704 (Ind. Ct. App. 2016). However, D.L.B.'s actions and adjudications in the present case are distinguishable from what occurred in *Gomez*. In *Gomez*, a panel of this court found that the defendant's three Class A misdemeanor battery convictions for grabbing the victim, slamming her into a wall, and pulling her hair, which occurred during one short, uninterrupted attack as defendant was trying to get the victim out of his home, was a continuous crime because the acts were "compressed in terms of time, place, singleness of purpose, and continuity of action so as to constitute a single transaction." *Id*. In the present case, although somewhat compressed in terms of time and place, the Class B misdemeanor battery, where D.L.B. punched Johnson immediately after entering the apartment, and the Level 5 felony battery with a deadly weapon,

where D.L.B. took turns with other individuals hitting Johnson with a golf club, were not sufficiently compressed in terms of singleness of purpose and continuity of action so as to constitute a single transaction for purposes of the continuous crime doctrine. The initial battery occurred close in time to when one of the sisters yelled, "[D.L.B.] beat his ass," *tr.* at 35-37, and the second battery was part of a group effort to attack Johnson after D.L.B.'s initial attack of Johnson. We conclude that D.L.B.'s adjudications for battery and battery with a deadly weapon do not violate the continuing crime doctrine. We, therefore, affirm D.L.B.'s adjudications of delinquency for Class B misdemeanor battery and Level 5 felony battery with a deadly weapon.

Affirmed.

Pyle, J., concurs.

Tavitas, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

D.L.B.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

Court of Appeals Case No.
20A-JV-713

**Tavitas, Judge, dissenting.**

[18] I respectfully dissent from the majority's conclusion that D.L.B.'s adjudications of delinquency for acts that, if committed by an adult, would be battery, a Class B misdemeanor, and battery with a deadly weapon, a Level 5 felony, do not violate the continuous crime doctrine. I conclude that D.L.B.'s actions that resulted in the two battery adjudications were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Anderson*, 15 N.E.3d at 149.

[19] The majority concludes that D.L.B.'s actions were "not sufficiently compressed in terms of singleness of purpose and continuity of action so as to constitute a single transaction for purposes of the continuous crime doctrine." Slip op. p.

10.  D.L.B.'s actions, however, occurred at the same location; occurred during the same continuous fight with Johnson; took place within a short amount of time; and were both in response to Johnson's argument with D.L.B.'s sister. Under these circumstances, I conclude that, as in *Gomez*, 56 N.E.3d at 704-05, the continuous crime doctrine applies, and I would vacate D.L.B.'s adjudication of delinquency for an act that, if committed by an adult, would be battery, a Class B misdemeanor.